O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARTHA ALICIA GOMEZ,           ) Case No. CV 12-8594-JPR
                               )
                Plaintiff,     )
                               ) MEMORANDUM OPINION AND ORDER
          vs.                  ) AFFIRMING THE COMMISSIONER
                               )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social         )
Security,[1]                   )
                               )
                Defendant.     )
                               )

I.    PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security disability insurance
benefits ("DIB") and supplemental security income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).
This matter is before the Court on the parties' Joint
Stipulation, filed June 19, 2013, which the Court has taken under

_____

     [1]   On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

submission without oral argument.   For the reasons discussed below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on December 10, 1971.  (Administrative Record ("AR") 85.)  She attended high school but did not complete 12th grade.  (AR 29.)  Plaintiff previously worked as a retail clerk and a shipping clerk.  (AR 30-31.)

On April 24 and 30, 2009, respectively, Plaintiff filed applications for DIB and SSI.  (AR 40-41, 85-96.)  After Plaintiff's applications were denied, she requested a hearing before an Administrative Law Judge ("ALJ").  (AR 58.)  A hearing was held on March 28, 2011, at which Plaintiff, who was not represented by counsel, and a vocational expert ("VE") testified. (AR 28-38.)  On April 19, 2011, the ALJ issued a written decision finding Plaintiff not disabled.  (AR 13-21.)  On June 13, 2011, Plaintiff requested review of the ALJ's decision.  (AR 8-9.)  On August 30, 2012, the Appeals Council denied her request for review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to

support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears

---

[2]  RFC is what a claimant can do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

1   the burden of establishing that the claimant is not disabled
2   because she can perform other substantial gainful work available
3   in the national economy.   §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
4   That determination comprises the fifth and final step in the
5   sequential analysis.   §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at
6   828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

7        B.   <u>The ALJ's Application of the Five-Step Process</u>

8        At step one, the ALJ found that Plaintiff had not engaged in
9   substantial gainful activity since February 4, 2008, the alleged
10  onset date.   (AR 15.)   At step two, the ALJ concluded that
11  Plaintiff had the severe impairments of degenerative disc
12  disease, depression, and bipolar disorder.   (<u>Id.</u>)   At step three,
13  the ALJ determined that Plaintiff's impairments did not meet or
14  equal any of the impairments in the Listing.   (AR 15-16.)   At
15  step four, the ALJ found that Plaintiff had the RFC to perform
16  "light work"[3] except that she could only

17       stand/walk 6 hours in an 8 hour period; sit 6 hours in an
18       8 hour period; occasionally climb, balance, stoop, kneel,
19       crouch, and crawl; and [has] mild limitations in
20       understanding and remembering tasks, sustain[ing]

21

22  _____
     [3]   "Light work" involves "lifting no more than 20 pounds
23  at a time with frequent lifting or carrying of objects weighing
    up to 10 pounds."   20 C.F.R. §§ 404.1567(b), 416.967(b).   The
24  regulations further specify that "[e]ven though the weight lifted
    may be very little, a job is in this category when it requires a
25  good deal of walking or standing, or when it involves sitting
    most of the time with some pushing and pulling of arm or leg
26  controls."   <u>Id.</u>   A person capable of light work is also capable
    of "sedentary work," which involves lifting "no more than 10
27  pounds at a time and occasionally lifting or carrying [small
    articles]" and may involve occasional walking or standing.
28  §§ 404.1567(a)-(b); 416.967(a)-(b).

1  concentration and persistence, socially interacting with

2  the general public, and adapting to workplace changes.

3  (AR 16.)  Based on the VE's testimony, the ALJ concluded that

4  Plaintiff could perform her past relevant work as a retail clerk

5  as well as other jobs that existed in significant numbers in the

6  national economy.  (AR 19-20.)  Accordingly, the ALJ determined

7  that Plaintiff was not disabled.[4]  (AR 21.)

8  **V.   DISCUSSION**

9  Plaintiff alleges that the ALJ erred in (1) determining

10  Plaintiff's mental RFC and (2) failing to properly assess her

11  credibility.  (J. Stip. at 3.)

12  A.   The ALJ Did Not Err in Determining Plaintiff's Mental

13  RFC

14  Plaintiff contends that in determining her RFC, the ALJ

15  "improperly rejected and misstated material medical evidence"

16  concerning Plaintiff's mental functioning.  (J. Stip. at 3.)

17  Specifically, Plaintiff contends that the ALJ erred by rejecting

18  "treating" physician Surinder Sidhy's opinion regarding

19  Plaintiff's mental limitations and instead relying on the opinion

20  of examining physician Joseph Mirkovich.  (J. Stip. at 4-6.)  As

21  discussed below, however, the ALJ properly determined Plaintiff's

22  RFC.

23  1.   Applicable law

24  In determining disability, the ALJ "must develop the record

25

26  [4]    The parties state that Plaintiff filed a second
application for DIB on June 16, 2011, and that on May 7, 2013, a
27  different ALJ found that Plaintiff had been disabled since April
20, 2011 — the day after the decision at issue in this case — and
28  awarded her DIB benefits.  (J. Stip. at 2.)

and interpret the medical evidence" but need not discuss "every piece of evidence" in the record.  Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003).  The ALJ is responsible for resolving conflicts in the medical evidence.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When evidence in the record is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources." §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints").

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining

7

physicians)." <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

The opinions of treating physicians are generally afforded more weight because they are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  <u>Carmickle</u>, 533 F.3d at 1164 (quoting <u>Lester</u>, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it.  <u>Id.</u> Further, the ALJ need not accept any medical opinion that conflicts with the physician's own treatment notes or the record

8

as a whole.  See Bayliss, 427 F.3d at 1216 (holding that
discrepancy between physician's notes and his assessment of
limitations was "clear and convincing" reason for rejecting
opinion); Connett v. Barnhart, 340 F.3d 871, 874-75 (9th Cir.
2003) (affirming ALJ's rejection of physician's RFC questionnaire
because it was "not supported by his own notes" and "had multiple
inconsistencies with all other evaluations" (alteration
omitted)).

        2.   Relevant facts

    On February 23, 2007, Dr. Gerald Ray Watkins at Kaiser
Permanente noted that Plaintiff was doing "significantly better"
on her psychiatric medication, was less emotionally labile and
anxious, "fe[lt] bad or sad less of the time," and had fewer and
less severe headaches.  (AR 203.)  He noted that Plaintiff still
awoke early in the morning and had "irregular" eating habits.
(Id.)  Plaintiff had an "unremarkable" mental-status exam and was
"not obviously tense, anxious, or in any distress."  (AR 204.)
He diagnosed bipolar II disorder, "[s]ignificantly improved";
major depression in partial remission, "[s]ignificantly (at least
moderately) improved"; dysthymic disorder, organic mood disorder,
pain disorder, and insomnia.  (Id.)

    On February 8, 2008, four days after the alleged onset date,
Dr. Watkins noted that since he had last seen Plaintiff a year
earlier, she had lost her home and her job at Walmart, suffered a
miscarriage, and given birth to a premature baby who had died
earlier that week.  (AR 202.)  He noted that Plaintiff was
"undeniably melancholic," "quite anxious," fidgety, restless, and
impatient, but she denied having suicidal ideation or delusions.

9

(Id.)  He diagnosed dysthymia; bipolar II disorder, major
depressive episode; organic mood disorder related to chronic
pain; pain disorder; and insomnia.  (Id.)  Dr. Watkins prescribed
medication and noted that Plaintiff would seek counseling through
a program for mothers who had lost children.  (AR 202-03.)

On June 16, 2009, Plaintiff underwent an Adult Initial
Assessment with E. Nagatani, a therapist at the Los Angeles
County Department of Mental Health ("DMH").  (AR 286-90, 306.)
Nagatani noted that Plaintiff reported receiving inpatient
psychiatric treatment in 1995 and 1996, and she currently
complained of daily depressed mood, sleep difficulties, poor
appetite, and an increase in symptoms since February 2008.  (AR
286.)  Nagatani noted that without treatment, Plaintiff was
agitated, irritable, and anxious; with treatment, Plaintiff "will
be stable and able to sleep better."  (Id.)  Upon examination,
Nagatani noted that Plaintiff had restless and agitated motor
activity, average grooming, normal eye contact, unimpaired but
pressured speech, unimpaired intellectual functioning and memory,
average fund of knowledge, irritable mood, constricted affect,
unimpaired thought process, and moderately impaired judgment and
insight.  (AR 289.)  Plaintiff had intact concentration but was
"easily distracted by outside stimulus."  (Id.)  Nagatani noted
that Plaintiff had poor impulse control and was aggressive,
demanding, violent, destructive, and self-destructive.  (Id.)
Nagatani diagnosed bipolar II and alcohol dependence and assigned

10

1  a Global Assessment of Functioning ("GAF") score of 51.[5]  (AR
2  290.)

3      On June 23, 2009, Plaintiff underwent an initial medication
4  evaluation with a DMH doctor.  (AR 440-42.)  The doctor diagnosed
5  bipolar affective disorder and post-traumatic stress disorder
6  ("PTSD") and prescribed medication.  (AR 442.)  On July 7, 2009,
7  a DMH doctor noted that Plaintiff had some anxiety, but her mood
8  and sleep were better and her appetite was "o.k."  (AR 439.)  The
9  doctor prescribed medication.  (Id.)

10     On August 4, 2009, Plaintiff began group therapy, which she
11  continued to attend about once a week until at least early
12  October 2009.  (AR 402-11.)  On September 8, 2009, a DMH doctor
13  noted that Plaintiff reported mood swings, depressed mood, low
14  motivation, low energy at times, and thoughts of death and dying.
15  (AR 435.)  On September 29, 2009, a DMH doctor noted that
16  Plaintiff had a flat mood and social anxiety.  (AR 437.)
17  Plaintiff complained of mood swings, but the doctor noted that
18  they were not readily evident that day.  (Id.)  The doctor noted
19  that Plaintiff had a diagnosis of major depressive disorder,
20  bipolar disorder, and PTSD and adjusted her medications.  (Id.)

21     On September 26, 2009, Dr. Joseph Mirkovich, a board-
22  certified psychiatrist, evaluated Plaintiff at the Social

24      [5]   A GAF score represents a rating of overall
25  psychological functioning on a scale of 0 to 100.  See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of
26  Disorders, Text Revision 34 (4th ed. 2000).  A GAF score in the
range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat
27  affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational or school functioning
28  (e.g., few friends, conflicts with peers or co-workers)."  Id.

Security Administration's request.  (AR 310-14.)  He noted that
Plaintiff was able to drive herself to her appointment and that
she reported two previous psychiatric hospitalizations, for
suicidal ideation and depression.  (AR 310-11.)  Plaintiff's
daily activities included staying at home, trying to clean her
room, performing household chores with her husband's help, doing
some cooking, taking care of her own hygiene and grooming,
reading books, and watching television, including "court shows."
(AR 311-12.)

Dr. Mirkovich found that Plaintiff had a dysthymic mood and
restricted affect but a normal and cooperative attitude and
behavior, logical mental activity, normal but soft speech, and
appropriate thought content.  (AR 312.)  Plaintiff was unable to
correctly spell the word "world" backward, but she could
correctly perform a three-step command, count by twos up to 20,
and do simple mathematical calculations.  (AR 312-13.)  Dr.
Mirkovich diagnosed "[b]ipolar 2 per history" and assigned a GAF
score of 55 to 60.  (AR 313.)  He opined that Plaintiff could
perform simple and repetitive tasks as well as detailed and
complex tasks and noted that Plaintiff "was able to perform well
in the mental status exam today."  (Id.)  He believed that
Plaintiff could accept instructions from supervisors, interact
with coworkers and the public, perform work activities on a
consistent basis without special or additional instruction,
maintain regular attendance in the workplace, complete a normal
workday and workweek without interruptions from a psychiatric
condition, and deal with the usual stress encountered in a
competitive work environment.  (AR 313-14.)

1    On September 29, 2009, a DMH doctor noted that Plaintiff
2 reported feeling "somewhat better" but was tired and not sleeping
3 well.  (AR 432.)   The doctor diagnosed bipolar II disorder and
4 PTSD and adjusted her medications.  (AR 433-34.)

5    On October 14, 2009, Dr. L.O. Mallare reviewed Plaintiff's
6 medical records and completed a mental-RFC assessment and
7 psychiatric-review-technique form.  (AR 324-37.)   In the mental-
8 RFC assessment, Dr. Mallare opined that Plaintiff was moderately
9 limited in her ability to understand, remember, and carry out
10 detailed instructions and respond appropriately to changes in the
11 work setting.[6]  (AR 324-25.)   He opined that Plaintiff was not
12 significantly limited in her ability to remember locations and
13 worklike procedures; understand, remember, and carry out very
14 short and simple instructions; maintain attention and
15 concentration for extended periods; perform activities on a
16 schedule; maintain regular attendance and be punctual; sustain an
17 ordinary routine without special supervision; work in
18 coordination with or proximity to others without being distracted
19 by them; make simple work-related decisions; complete a normal
20 workday and workweek; perform at a consistent pace; interact with
21 the public; ask simple questions or request assistance; accept
22 instructions and respond appropriately to criticism from
23 supervisors; get along with coworkers without distracting them or
24 exhibiting behavioral extremes; maintain socially appropriate
25
26
27    [6]    The mental-RFC-assessment form included check-off boxes
   for indicating whether a claimant was "[n]ot [s]ignificantly
28 [l]imited," "[m]oderately [l]imited," or "[m]arkedly [l]imited"
   in each of several categories.  (See AR 324-25.)

13

behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places and use public transportation; or set realistic goals and make plans independently of others. (AR 324-25.) Dr. Mallare also noted that Plaintiff had "adequate mental function to perform 1-2 step and some detailed instr[uctions]" and was able to interact appropriately with others and adapt to simple changes in the workplace. (AR 326.)

On the psychiatric-review-technique form, Dr. Mallare noted Plaintiff's diagnoses as "BAD," or bipolar affective disorder, and substance abuse. (AR 330, 333.) He opined that Plaintiff's mental impairments resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (AR 335.) Dr. Mallare also indicated that he had reviewed Dr. Mirkovich's September 2009 report and "various intermittent notes" dating from December 2006 to June 2009. (AR 337.)

On October 20, 2009, a DMH doctor noted that Plaintiff had no abnormalities on mental-status examination and that her "unstable mood" had "improved substantially since the start of treatment." (AR 430-31.) The doctor adjusted Plaintiff's medication. (AR 431.) On December 2, 2009, a DMH doctor noted that Plaintiff had no abnormalities on mental-status examination and prescribed medications. (AR 428-29.) On December 20, 2009, and February 4, 2010, a DMH doctor met with Plaintiff and adjusted her medications. (AR 423-24, 426-29.) On February 23,

14

2010, a DMH doctor recorded "no notable findings" on mental-status examination and prescribed medication.  (AR 421-22.)

On March 10, 2010, Dr. C. Dudley, a nonexamining reviewing doctor, affirmed Dr. Mallare's assessment of Plaintiff's mental functioning.  (AR 384-85.)  On March 17, 2010, a DMH doctor noted that Plaintiff complained of feeling restless, depressed, and anxious.  (AR 420.)  On March 18, 2010, a DMH doctor noted that Plaintiff appeared depressed but did not have hallucinations or delusions; the doctor prescribed medication.  (AR 418-19.)

On March 31, 2010, a DMH doctor noted that Plaintiff complained that she felt depressed, tired, and aggravated and could not take care of her six-year-old daughter.  (AR 417.)  The doctor noted that Plaintiff had a depressed and irritable mood and fair insight and judgment.  (Id.)  The doctor diagnosed bipolar disorder, manic and paranoid, and prescribed medication.  (Id.)  On May 10, 2010, a DMH doctor noted that Plaintiff complained of depression, anxiety, restlessness, and insomnia.  (AR 416.)  The doctor noted that Plaintiff's mood was depressed and affect constricted, and she had "severe psychomotor retardation"; the doctor diagnosed "bipolar illness" and chronic alcoholism and prescribed medication.  (Id.)

Also on May 10, 2010, Dr. Sidhy, a DMH physician, completed a mental-disorder-questionnaire form that listed the "[d]ate of first examination" as May 10, 2010, the same date she was completing the report.[7]  (AR 390-94.)  Dr. Sidhy noted that

---

[7]   Although Dr. Sidhy's notes do not indicate the doctor's gender, Plaintiff and the ALJ refer to the doctor as "she."  (See AR 19; J. Stip. at 4.)  The Court therefore does as well.

Plaintiff was irritable, anxious, and "severely depressed." (AR 390, 392.) She had a "very slow" gait, a "blank" stare, severe psychomotor retardation, poor concentration, poor insight and judgment, and a fair memory. (AR 390-91, 393.) Plaintiff reported that she spent most of the day at home and sometimes cooked dinner for her family. (AR 391.)

Dr. Sidhy listed Plaintiff's diagnosis as major depression with psychosis and noted that her prognosis was "poor." (AR 394.) Dr. Sidhy noted that Plaintiff was "afraid of people," communicated poorly, and was isolated and withdrawn. (AR 393.) Dr. Sidhy believed that Plaintiff was unable to sustain concentration but was able to understand written and verbal commands. (Id.) Dr. Sidhy opined that because of Plaintiff's major depression with psychosis, she was unable to handle any stresses at work and was unable to make any decisions. (Id.) She concluded that Plaintiff was "totally disabled," "unable to function," and "unable to drive her car." (Id.)

          3.   Discussion

The ALJ found that despite Plaintiff's mental impairments, she retained the RFC to perform a limited range of light work, with only "mild limitations in understanding and remembering tasks, sustain[ing] concentration and persistence, socially interacting with the general public, and adapting to workplace changes." (AR 16.) In doing so, the ALJ accorded "significant weight" to the opinions of examining physician Mirkovich and nonexamining physician Mallare and "little weight" to the opinion of Dr. Sidhy. (AR 18-19.)

The ALJ gave specific and legitimate reasons for rejecting

16

Dr. Sidhy's findings and controverted opinion that Plaintiff was totally disabled.  <u>See</u> <u>Carmickle</u>, 533 F.3d at 1164.  First, the ALJ correctly concluded that he need not accept Dr. Sidhy's assertion that Plaintiff was totally disabled because the determination of a claimant's ultimate disability is reserved to the Commissioner.  (AR 19); <u>see</u> §§ 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), 416.927(d)(1) (same); SSR 96-5p, 1996 WL 374183, at *5 (treating-source opinions that a person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); <u>see also</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 885 (9th Cir. 2011) (as amended) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity.").  The ALJ therefore was not obligated to accept Dr. Sidhy's opinion that Plaintiff was totally disabled.

Second, the ALJ permissibly discounted Dr. Sidhy's findings that Plaintiff had significant psychological symptoms because they conflicted with the treatment records, which indicated that "[Plaintiff's] symptoms significantly improved with medication" and therapy.  (AR 18); <u>see</u> <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); §§ 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more

17

weight we will give to that opinion."), 416.927(c)(4) (same); <u>see also</u> <u>Valentine v. Comm'r, Soc. Sec. Admin.</u>, 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and evidence in record, including his own treatment notes, constituted specific and legitimate reason for rejecting treating physician's opinion).  Indeed, Plaintiff began receiving consistent mental-health treatment in June 2009, and by July 2009, Plaintiff was noted to have some anxiety, but her mood and sleep were better and her appetite was "o.k." (AR 439.)  In September 2009, she was feeling tired but "somewhat better" (AR 431); in October 2009, she was noted to have made progress during her three months of group therapy (AR 402), and a doctor found she had no abnormalities on mental-status exam and her "unstable mood" had "improved substantially since the start of treatment" (AR 430-31); and in December 2009 and February 2010, doctors noted no abnormalities during mental-status examinations (AR 421-22, 428-29).  In September 2009, Dr. Mirkovich similarly found that Plaintiff was able to perform well on a mental-status exam. (AR 313.)  Indeed, Plaintiff's medical records from before her onset date also showed that her condition responded well to treatment.  (<u>See, e.g.</u>, AR 203 (Feb. 2007, noting that Plaintiff was "significantly better" on psychiatric medication).)  Dr. Sidhy's observation that Plaintiff was "unable to drive her car" (AR 393) was also inconsistent with Plaintiff's own testimony at the March 2011 hearing that she was able to drive (AR 34-35) and with Dr. Mirkovich's September 2009 observation that Plaintiff had driven herself to the appointment (AR 310).  Dr. Sidhy's inconsistency with the treatment notes and the evidence of record

18

1  was therefore a specific and legitimate reason for discounting

2  Dr. Sidhy's opinion.

3      Third, the ALJ found that Dr. Sidhy's opinion was entitled

4  to less weight because she "did not have a treating relationship

5  with [Plaintiff] prior to making her conclusions" and in fact

6  "first examined [Plaintiff] the same day that she rendered her

7  opinion." (AR 19.) Indeed, Dr. Sidhy reported that she had

8  first examined Plaintiff on "5-10-10," the same day she completed

9  the mental-disorder-questionnaire form. (AR 394.) The ALJ was

10 entitled to consider Dr. Sidhy's limited relationship with

11 Plaintiff when determining how much weight to give her opinion.

12 See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in

13 assessing treating physician's opinion include length of

14 treatment relationship, frequency of examination, and nature and

15 extent of treatment relationship); accord §§ 404.1527(c)(2),

16 416.927(c)(2).

17     The ALJ was also entitled to rely on Drs. Mirkovich's and

18 Mallare's opinions because they were supported by independent

19 clinical findings and thus constituted substantial evidence upon

20 which the ALJ could properly rely. See Tonapetyan v. Halter, 242

21 F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d

22 1035, 1041 (9th Cir. 1995). Dr. Mirkovich noted Plaintiff's

23 psychiatric history and performed a full psychiatric evaluation,

24 finding, for example, that Plaintiff had a dysthymic mood and

25 restricted affect but normal and cooperative attitude and

26 behavior, logical mental activity and speech, and appropriate

27 thought content; could perform a three-step command correctly;

28 and had "good mathematical ability." (AR 312-13.) Dr. Mallare's

19

opinion, moreover, relied on Dr. Mirkovich's findings and was
consistent with them.  See Thomas v. Barnhart, 278 F.3d 947, 957
(9th Cir. 2002) ("The opinions of non-treating or non-examining
physicians may also serve as substantial evidence when the
opinions are consistent with independent clinical findings or
other evidence in the record.").  Dr. Mallare also reviewed some
of Plaintiff's medical records before rendering his opinion.  (AR
337.)  See §§ 404.1527(c)(3) (in weighing medical opinions, ALJ
"will evaluate the degree to which these opinions consider all of
the pertinent evidence in [claimant's] claim, including opinions
of treating and other examining sources"), 416.927(c)(3) (same).
Indeed, Plaintiff does not challenge the ALJ's reliance on Dr.
Mallare's opinion.  (See J. Stip. at 3-7, 11-13.)  Any conflict
in the properly supported medical-opinion evidence was "solely
the province of the ALJ to resolve."  Andrews, 53 F.3d at 1041.

        Plaintiff contends that the ALJ erred in relying on Dr.
Mirkovich's opinion because it was inconsistent with his findings
that Plaintiff had a dysthymic mood, restricted affect, tired
appearance, and GAF score of 55-60, which indicated moderate
psychological symptoms.  (J. Stip. at 6); Am. Psychiatric Ass'n,
supra, at 34.  Notwithstanding those symptoms, however, Dr.
Mirkovich found that Plaintiff was cooperative, with logical and
normal mental activity and speech and appropriate thought
content; could perform a three-step command and simple
mathematical computations; and was able to perform "well" on the
mental-status exam.  (AR 312-13.)  Those findings support Dr.
Mirkovich's conclusion that Plaintiff could, for example, perform
simple and detailed tasks, accept instruction from supervisors,

20

interact with coworkers and the public, and maintain regular
attendance in the workplace.  (AR 313-14.)  They were also
consistent with the findings of one of Plaintiff's treating
doctors, who noted, around that same time, that Plaintiff had no
abnormalities on mental-status examination and that her unstable
mood had improved "substantially" since she started treatment.
(AR 430-31.)

Plaintiff is not entitled to remand on this ground.

B.   The ALJ Permissibly Discounted Plaintiff's Credibility

Plaintiff argues that the ALJ "improperly undermined
Plaintiff's credibility and rejected her testimony regarding her
symptoms and limitations in mental functioning."[8]  (J. Stip. at
13.)

1.   Applicable law

An ALJ's assessment of symptom severity and claimant
credibility is entitled to "great weight."  See Weetman v.
Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to
believe every allegation" of disability, or else disability
benefits would be available for the asking, a result plainly
contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674
F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and
citation omitted).  In evaluating a claimant's subjective symptom
testimony, the ALJ engages in a two-step analysis.  See
Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

---

[8]   Plaintiff does not challenge the ALJ's rejection of her
testimony regarding her physical complaints.  (See J. Stip. at
13-15, 20-22.)

determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (internal quotation marks omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original). When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

            2.   Relevant facts

     On May 20, 2009, Plaintiff completed a function-report form, stating that on a "good day," which was "rare," she would take her daughter to school, take her medication, "hopefully" clean up a bit, pick her daughter up at 11 a.m. and "tend to her needs," nap, give her daughter lunch and play with her, make dinner, and watch television. (AR 127.) She cooked "daily for the most part" and made "quick and easy meals." (AR 129.) She performed "basic cleaning," which would take all day because she would stop to take breaks. (Id.) Plaintiff wrote that she would take care of her husband and two children by cooking, cleaning, and

attending to other household needs "when I can." (AR 128.)
Plaintiff wrote that on "bad day[s]," which outnumbered her good
days, she would "only tend to [her] little one [and] do nothing
else because of [her] back pain [and] depression." (AR 134.)

Plaintiff wrote that she went outside two or three times a
week but could not go out alone and needed her husband or kids to
go with her. (AR 130.) She shopped in stores for groceries and
clothing for her children, which would take "less than an hour"
because she would get "tired" and "anxious around people." (Id.)
Plaintiff got along well with authority figures and was able to
pay bills, count change, and use money orders. (AR 130, 133.)
Her hobbies included watching television, which she did every
day, and reading, which she did "once in a while." (AR 131.)

Plaintiff wrote that her conditions affected her ability to
lift, squat, bend, stand, walk, sit, kneel, talk, climb stairs,
remember, concentrate, complete tasks, and get along with others.
(AR 132.) She could walk for less than 30 minutes before needing
to rest for 15 and could pay attention for one hour before
"get[ting] annoyed." (Id.) Plaintiff could follow written
instructions "ok" but would "forget and have to read [them]
again," and she could "sometimes" follow spoken instructions
well. (Id.) Plaintiff wrote that she had been fired from her
job at Walmart because she was dating her supervisor. (AR 133.)

In an undated disability report, Plaintiff wrote that she
was unable to work because of her bipolar disorder, chronic back
pain, anxiety, and depression. (AR 116.) She wrote that she
"c[ouldn't] stand to be around people anymore" or stand or sit
for a "long time" and was "always in pain" and "very withdrawn

23

and irritable all the time." (_Id._)  Plaintiff wrote that she
last worked on December 24, 2007, and left that job because it
was seasonal and she was pregnant. (_Id._)  She wrote that she
became unable to work because of her disability on February 4,
2008. (_Id._)

    In an undated "Disability Report – Appeal," Plaintiff wrote
that regarding her physical conditions, she could "no longer
function without pain medication," and regarding her mental
limitations, she couldn't function "properly" and was working
with a psychiatrist to find the correct medications. (AR 160.)
In another undated "Disability Report – Appeal," Plaintiff wrote
that her back condition was "ok" as long as her doctor kept
giving her "shots," but she still had spasms. (AR 172.)
Plaintiff wrote that even with medication, she "fe[lt] worse
mentally" and couldn't "find any peace." (_Id._)

    At the hearing on March 28, 2011, Plaintiff testified that
she was unable to work because her back would "spasm" a lot, she
was "bipolar," and she had "anxiety issues." (AR 31-34.)
Plaintiff believed she could stand or walk for a few hours, sit
for a "couple hours" in an eight-hour day, and comfortably lift
about 20 pounds at a time. (AR 32-33.)  Plaintiff testified that
she could drive and would try to cook and do the dishes and
laundry, but her husband helped her or did a lot of the chores
himself. (AR 34-35.)  Plaintiff and her husband would go grocery
shopping and pick her daughter up from school. (AR 35.)  She
said she didn't "really do a whole lot of . . . anything" and
usually "s[a]t at home" watching television. (_Id._)  Plaintiff
said she had just started treatment at DMH but would not receive

24

psychiatric medication for about two more months.  (AR 34.)
Plaintiff also testified that she was fired from her retail job
because she had been having a relationship with her supervisor.
(AR 31.)

### 3. <u>Discussion</u>

The ALJ found that Plaintiff's medically determinable
impairments could reasonably be expected to produce the alleged
symptoms but that her "statements concerning the intensity,
persistence and limiting effects of these symptoms are not
credible to the extent they are inconsistent with" an RFC for a
limited range of light work with mild limitations in
understanding and remembering tasks, sustaining concentration and
persistence, socially interacting with the general public, and
adapting to workplace changes.  (AR 17.)  Reversal is not
warranted based on the ALJ's alleged failure to make proper
credibility findings or properly consider Plaintiff's subjective
symptoms.

First, the ALJ discounted Plaintiff's subjective complaints
because her "psychiatric symptoms appear stable with medication
and therapy."  (AR 19.)  As discussed above in Section V.A,
Plaintiff's psychiatric symptoms did improve "substantially"
after she started treatment, and she was often noted to have no
abnormal findings upon mental-status examination, which was
inconsistent with Plaintiff's allegations of totally debilitating
psychiatric symptoms.  (<u>See, e.g.</u>, AR 430-31.)  This was
therefore a legally sufficient reason for discounting Plaintiff's
credibility.  <u>See</u> <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d
1219, 1227 (9th Cir. 2009) (ALJ permissibly discounted

credibility when claimant's "statements at her hearing [did] not comport with objective evidence in her medical record"); Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); see also Garcia v. Comm'r of Soc. Sec. Admin., 498 F. App'x 710, 711 (9th Cir. 2012) (ALJ permissibly discounted plaintiff's credibility based on conflicts between his testimony and doctor's testimony); cf. Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Second, the ALJ was entitled to discount Plaintiff's credibility because her claims of disability conflicted with her reported daily activities.  (See AR 19); Smolen, 80 F.3d at 1284 (ALJ may use "ordinary techniques of credibility evaluation," such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"); Thomas, 278 F.3d at 958-59 (in assessing credibility, ALJ may consider inconsistencies either in claimant's testimony or between testimony and conduct); cf. Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  Plaintiff asserted that she was able to shop in stores for groceries and clothing; care for her young daughter and take her to and from school; get along well with authority figures; cook most days; perform basic cleaning, albeit with some help; pay bills and use money orders; watch television,

including court shows; and read.  (AR 34-35, 127, 129-30, 134.)
Those activities appear inconsistent with Plaintiff's claims that
she was totally disabled and, for example, "c[ouldn't] stand to
be around people anymore," was "very withdrawn and irritable all
the time," and couldn't function "properly" because of her
psychological condition.  (AR 132, 160.)

　　　One of the ALJ's credibility findings, however, was not
clear and convincing.  The ALJ noted that Plaintiff had stopped
working because she was fired from her job at Walmart for having
a relationship with her supervisor, not because she was disabled
and unable to perform her job.  (AR 19.)  The Commissioner argues
that this was a permissible reason for discounting Plaintiff's
credibility, citing <u>Bruton v. Massanari</u>, 268 F.3d 824, 828 (9th
Cir. 2001).  (J. Stip. at 18.)  But in <u>Bruton</u>, the claimant's
alleged disability-onset date was the same date he was laid off
from his job as a machinist, and the Ninth Circuit found that the
ALJ permissibly discounted the claimant's credibility based on
his statements that "he left his job because he was laid off,
rather than because he was injured."  268 F.3d at 826, 828.
Here, by contrast, Plaintiff never claimed to have stopped
working at Walmart because she was disabled; in fact, she
thereafter worked at another retail job for about a month before
stopping work on December 24, 2007, assertedly because it was a
seasonal job and she was pregnant.  (AR 30, 116.)  Plaintiff's
alleged onset date, moreover, was over a month later, on February
4, 2008, apparently right around the time she gave birth to a
premature baby who soon died.  (<u>See</u> AR 202.)  The fact that
Plaintiff was fired from her job at Walmart months before her

1   alleged disability onset date thus does not appear to be a clear
2   and convincing reason for discounting her credibility.  See
3   McGowan v. Astrue, No. C12-281-TSZ-BAT, 2012 WL 5390337, at *5
4   (W.D. Wash. Oct. 17, 2012) (noting that "the reasons [plaintiff]
5   left her 2006 job was [sic] not a proper basis to discount her
6   credibility" because the job "ended long before her alleged
7   [disability] onset"); Shehan v. Astrue, No. EDCV 08-01302(MLG),
8   2009 WL 2524573, at *3 (C.D. Cal. Aug. 17, 2009) (noting that
9   "[u]nlike Bruton, the record here does not support the inference
10  that Plaintiff sought disability benefits simply because she was
11  laid off from work," because "[a]lthough Plaintiff admitted that
12  she stopped working in her previous two positions for reasons
13  unrelated to her alleged impairments, both jobs ended long before
14  her alleged onset date of August 2005").  The ALJ's error,
15  however, was harmless because his credibility finding was
16  supported by other clear and convincing reasons.  See Bray, 554
17  F.3d at 1227; Carmickle, 533 F.3d at 1162.[9]

18      In sum, the ALJ provided sufficient clear and convincing
19  reasons for discounting Plaintiff's credibility.  Plaintiff is
20  not entitled to remand on this ground.

21

22  _____

23      [9]    The ALJ also noted that "no evidence" indicated "severe
    disuse muscle atrophy that would be compatible with [Plaintiff's]
24  alleged inactivity and inability to function."  (AR 19.)  The
    observation of no severe muscle atrophy, while true, was not
25  particularly meaningful because Plaintiff did not claim to be
    unable to perform any activity at all.  Compare Meanel v. Apfel,
26  172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ permissibly discounted
    claimant's complaint that her pain required her to "lie in a
27  fetal position all day" because she "did not exhibit muscular
    atrophy or any other physical signs of an inactive, totally
28  incapacitated individual").

28

**VI.    CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 4, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[10]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."